236 P.2d 749

SMITH v. PHLEGAR.
No. 5342.

Supreme Court of Arizona.
Oct. 15, 1951.

W. H. Chester, of Phoenix, for appellant.

Carl W. Divelbiss, of Phoenix, for appellee.

UDALL, Chief Justice.

This is an appeal by the defendant (appellant—Thad G. Smith) from a judgment of $14,600, entered against him on the plaintiff's (appellee) complaint, denying his counterclaim, and foreclosing an attachment lien upon certain equipment and real estate belonging to the defendant.

On Sept. 17, 1948, the plaintiff, E. O. Phlegar, and defendant entered into a written contract, whereby the defendant

agreed to build 29 homes, known as the Camelback Homes Subdivision, Phoenix, Arizona, and the plaintiff agreed to loan the defendant and his wife $15,000. The material parts of the contract as regards this appeal are set out as follows:

"1. That the Party of the Second Part (Phlegar) loans to the Party of the First Part the sum of Fifteen thousand Dollars ($15,000.00), receipt of which is hereby acknowledged by the Party of the First Part (Smith), same to be deposited to the account of Thad G. Smith Construction Account in the First National Bank of Arizona, Head Office, Phoenix, and to be *withdrawn only upon the joint signatures* of Thad G. Smith or Marie L. Smith and E. O. Phlegar, and said funds, together with any and all other funds herein mentioned, shall be used only in the building project above proposed. (Emphasis supplied.)

"2. The Party of the First Part to act as contractor, and shall have *complete and unhampered supervision and management* of all construction, purchasing, employing of workmen, and selling the completed houses, and any and all matters in connection with said project. (Emphasis supplied.)

\*　　\*　　\*　　\*　　\*　　\*

"5. The Party of the First Part as said contractor shall construct said houses in a workman-like manner, *shall procure Federal Housing Administration commitments*, have F. H. A. approved plans and specifications, and *finance said dwelling houses through F. H. A. or some other financing agency.* (Emphasis supplied.)

\*　　\*　　\*　　\*　　\*　　\*

"7. The Party of the Second Part agrees not to interfere with the construction and sale of said houses so long as the money so advanced, and such other funds obtained as advances for said construction, is actually spent on said project; and the Party of the First Part agrees as said contractor *not to use or spend any of said funds except on said project, and to commence said construction work as soon as possible and to continue at as rapid rate of construction as is reasonable* and as will be to the best interest of the parties hereto, and the production of as much profit as possible." (Emphasis supplied.)

Simultaneously with the execution of this agreement the defendant and his wife signed a demand promissory note, payable to plaintiff for $15,000 with interest at the rate of one-half of one per cent per annum. The note provides that it is given pursuant to the agreement and that the makers "further agree to pay said sum of $15,000 personally in the event same is not paid through said agreement".

Both prior to the agreement and for a few weeks thereafter the defendant did some preliminary work on the project, such as platting the subdivision, obtaining tentative commitments from the F. H. A., installing the domestic water system, arranging for lights, power and gas, laying and staking out the streets, leveling the lots,

and planning a system of irrigation ditches, etc. Defendant made application to the Allied Building Credits, Inc., a financing organization, for the additional finances necessary to construct such homes, but was told that since it appeared plaintiff had an interest in the project that he must furnish them a financial statement. If plaintiff's statement was satisfactory they would then accept him either as a principal or a surety on a completion bond. Plaintiff refused to furnish the statement or have anything to do with the financing operations.

The work on the project "bogged down" in the latter part of October because of the defendant's failure to obtain the additional financing. Nothing further was done until January 21, 1949, when defendant withdrew, on his signature alone, the remaining balance of $8,200 from the Construction Bank Account. The next day the plaintiff started suit on the promissory note and attached the defendant's construction equipment which was then being loaded on railroad cars preparatory for shipment to Lubbock, Texas.

On February 24, 1949, defendant filed a voluntary petition in bankruptcy in the U. S. District Court, and was adjudged a bankrupt on June 16, 1949. Defendant filed a "Motion to Abate" the action in the trial court pending the determination of the bankruptcy proceedings, but the motion was denied. He then answered the amended complaint and counterclaimed against plaintiff alleging that the plaintiff was the

one who had breached the contract and sought actual damages against him in the sum of $30,000, together with $15,000 punitive damages. At the trial, which was before the court sitting without a jury, defendant offered no evidence as to any damages on his counterclaim.

Bankruptcy—Motion to Abate

Defendant assigns as error the denial of his "Motion to Abate" the action because he maintains the pending petition in bankruptcy ousted the trial court from jurisdiction in the matter. This assignment is based upon 11 U.S.C.A. § 29 as amended, which reads:

"a. A suit which is founded upon a claim from which a discharge would be a release, and which is pending against a person at the time of the filing of a petition by or against him, *shall* be stayed until an adjudication or the dismissal of the petition; if such person is adjudged a bankrupt, such action *may* be further stayed until the question of his discharge is determined by the court after a hearing, or by the bankrupt's filing a waiver of, or having lost, his right to a discharge * *. (Emphasis supplied.)

"b. The court may order the receiver or trustee to enter his appearance and defend any pending suit against the bankrupt."

Defendant labeled his motion a "Motion to Abate", which technically speaking is wrong. "To Abate" an action as defined in 1 Words & Phrases, page 65,

means the action is utterly dead and cannot be reviewed except by commencing anew. The quoted section, above, provides only that the action is to be stayed pending determination by the bankruptcy court and not that it is to be dismissed. But even so, we construe the motion as if it was properly designated, i. e., as a "motion to stay".

■ The proper procedure in these situations is for the motion to be first presented to the state court where the action is pending, to give that court an opportunity to dispose of it. If refused, then the bankrupt should proceed in the bankruptcy court for an injunction enjoining the plaintiff from proceeding further. In re Innis, 7 Cir., 140 F.2d 479. Under 11 U.S.C.A. § 29, supra, the stay is given as a matter of right until adjudication, and after adjudication, a matter of discretion with the court. Connell v. Walker, 291 U.S. 1, 54 S.Ct. 257, 78 L.Ed. 613. A state court it not deprived of jurisdiction by the mere adjudication in bankruptcy where the suit was started before the petition in bankruptcy is filed and the action is not enjoined by the bankruptcy court, but may proceed and render a valid judgment. 6 Am.Jur., Bankruptcy, Sec. 301; Brazil v. Azevedo, 32 Cal.App. 364, 162 P. 1049; Bushong v. Theard, 5 Cir., 37 F.2d 690.

■ 11 U.S.C.A. § 29, supra, is for the protection of the bankrupt and may be waived by him. It is his duty after the state court denies his motion to take the necessary steps in the bankruptcy court to have the action stayed. State courts are not automatically deprived of their jurisdiction unless ousted by the bankruptcy court.

■ If denying the motion to abate was error, we hold that it was not reversible error, because in view of the later proceedings, i. e., the admission of the trustee as a codefendant, the referee's order disclaiming this appeal as burdensome, onerous and of no value to the bankrupt's estate, and chiefly the order of the trial court that the execution of the judgment and further proceedings in the action be stayed pending action by the bankruptcy court, the defect was cured. The trial court had jurisdiction notwithstanding the bankruptcy, which continued until proper action was taken to stay the proceedings.

### The Contract

The basic issues may be resolved by a true interpretation of the contract entered into by the parties. They are as far apart as the poles in their construction of this agreement heretofore set forth. The plaintiff contends that by the terms thereof, he is only obligated to do the following: advance the $15,000, cosign the checks and refrain from any interference in the construction of the houses. He further maintains that by the express terms of the note sued upon that the monies which he advanced were to be repaid whether the building venture was a success or a failure and that the agreement for payment to him of a stipulated share of the net

profits (presumably in lieu of the usual interest rate) did not create a copartnership or a joint venture. While the defendant does not expressly state that it was a partnership agreement, he does, on the other hand, seek to read into the instrument an express (or at least an implied) duty on the part of the plaintiff to aid him with the financing operations on the project by first furnishing a qualifying financial statement and then signing a performance bond to the lending agency either as a principal or surety.

A joint venture differs from a partnership principally in that it is limited to a single transaction. Ruby v. United Sugar Companies, 56 Ariz. 535, 109 P.2d 845; Estrella v. Suarez, 60 Ariz. 187, 134 P.2d 167. The matter of sharing profits and losses, and the intention of the parties are two important tests of a partnership relation. The law as to these is well-stated in 40 Am.Jur., Partnership, sections 33 and 43. For a case most nearly in point to the case at bar, both as to the facts and law, see National Surety Co. v. Winslow, 143 Minn. 66, 173 N.W. 181.

As to this matter of the intention of the parties the testimony of plaintiff is to the effect that it was agreed between them this "was not a partnership, a co-venture or anything of the sort". John M. Hazelitt, a C.P.A., corroborated this testimony and it was not denied by the defendant.

This agreement is not complicated, it is simple in its language and clearly defines the obligations and relationship of the parties, one to the other. In such a situation there is no justification for attempting to invoke implied covenants. The rule is well-stated in 14 Am.Jur., Covenants, Conditions and Restrictions, section 14, which reads in part: " * * * implied covenants are not favored in the law. Such covenants can arise only where there is no expression on the subject. The courts will declare implied covenants to exist only when there is a satisfactory basis in the express contract of the parties which makes it necessary to imply certain duties and obligations in order to effect the purposes of the parties to the contract made. Such covenants can be justified only upon the ground of legal necessity arising from the terms of a contract or the substance thereof. The implication from the words must be such as will clearly authorize the inference of an imputation in law of creation of a covenant. It is not enough to say that it is necessary to make the contract fair, that it ought to have contained a stipulation which is not found in it, or that without such covenant it would be improvident, unwise, or operate unjustly." Cf., Sligh v. Watson, 69 Ariz. 373, 214 P.2d 123, and Crone v. Amado, 69 Ariz. 389, 214 P.2d 518.

The evidence adduced by defendant that insurance men, brokers and others had interpreted the contract as creating a partnership had no probative value for in the final analysis it presented a question of law for the court. While no

finding of facts or conclusions of law were either requested or made, however it is apparent that the trial court by entering its judgment accepted the view of the plaintiff that no partnership existed, hence the matter of financing the building program was the complete and sole duty and obligation of the defendant, under the clause of the agreement reading: "5. The Party of the First Part * * * shall * * * finance said dwelling houses through F.H.A. or some other financing agency." We are of the opinion that the holding of the trial court was manifestly correct. Adopting this interpretation the matters alleged in the answer to the amended complaint did not constitute a defense, as the plaintiff had done everything required of him under the contract. Defendant's counterclaim which is predicated upon the same erroneous concept of the contract must fall with it.

Plaintiff had the right to sue on the note, without first making a demand for payment. Furthermore the defendant's bad faith in surreptitiously withdrawing the remaining balance of $8,200 from the construction bank account, and the attempt to ship his equipment out of the state to avoid an attachment, virtually put it beyond his means to carry out his part of the contract. Such conduct constituted an anticipatory breach of contract which entitled the plaintiff to sue forthwith. No houses had been completed or even started during this four-month period which was a good indication that the defendant was unable to, or had no intention of going through with the project.

Exemption Claim

The final assignment of error is that the equipment seized by the sheriff on attachment was exempt property and therefore not subject to levy under subdivisions 3, 5, 7, and 10 of section 24–601, A.C.A.1939. The record shows that the two-page itemized list of personal property attached consisted of the usual equipment and paraphernalia of a contractor including such items as motor trucks, cement finishing machines, cement mixers, air compressors, transit and tripod, tractors, bulldozers, portable saws, nails and building materials, outboard motor, etc. Apparently it is the *serious* contention of the defendant that such items are exempt under the subdivision which reads: "The tools or implements of a mechanic or artisan necessary to carry on his trade; * * *." We deem it unnecessary to determine whether this contention is tenable for the reason that it appears that the defendant made no claim before the trial court that any of such property was exempt, nor was any motion made to have the levy vacated as provided by section 25–117, A.C.A.1939, hence there is no action of the trial court for us to review. A claim for exemption must be timely made and it is a privilege which the possessor may waive or exercise at his pleasure and it cannot be urged for the first time in the appellate court. There

is an additional reason in the instant case why there is no merit to this assignment and that is the defendant having been adjudged a bankrupt, the bankruptcy court under 11 U.S.C.A. § 11, has exclusive jurisdiction to "determine all claims of bankrupts to their exemptions". Morgridge v. Converse, 150 Ohio St. 239, 81 N.E.2d 112; Booth v. Bates, 215 Ala. 632, 112 So. 209; In re Urban, 7 Cir., 136 F.2d 296.

The learned trial court recognized this principle of law for the minutes show that "proceedings in this action (i. e., foreclosure of attachment lien) to be stayed, however, pending adjudication in the matter in the U. S. Bankruptcy Court".

Judgment affirmed.

STANFORD, PHELPS, DE CONCINI and LA PRADE, JJ., concur.